(12 Misc. Rep. 278.)

PARFITT v. KINGS COUNTY GAS & ILLUMINATING CO. et al.

(Supreme Court, Special Term, Kings County.   April, 1895.)

1. EQUITY—RESCISSION OF CONTRACT.
   In an action to rescind an executed contract under which rights of third persons have arisen, a stronger degree of evidence will be required to establish its invalidity than if it was an executory contract.
2. CONTRACTS—PUBLIC POLICY.
   A contract will not be decreed void as against public policy, where it is expressly authorized by statute.
3. MUNICIPAL CORPORATIONS—CONTRACTS—UNREASONABLE PROVISIONS.
   A provision in a contract for lighting the streets of a town, forbidding the municipality from diminishing the number of lamps, is not so unreasonable as to lead to an inference of fraud.

Action by Walter E. Parfitt against the Kings County Gas & Illuminating Company, impleaded, to set aside contracts between defendant and the board of improvements of the town of New Utrecht.   Complaint dismissed.

Edward M. Grout, for plaintiff.
Benjamin F. Tracy, William J. Kelly, James C. Church, and Herbert E. Ketcham, for defendants.

SMITH, J.   The plaintiff has assumed to state in his complaint three causes of action:   (1) To set aside the original contract between the board of improvement of the town of New Utrecht and the defendant gas company, dated 28th December, 1889;   (2) to set aside the contract of extension, by which the life of the original contract was extended for 15 years, which contract of extension was dated 19th March, 1891;   (3) to declare void the action of the said board of improvement, so far as by its order lamps were wastefully, improvidently, and fraudulently caused to be placed in certain parts of the town sparsely inhabited.   It is not necessary to set out the allegations of fraud and illegality in the complaint.   Some of them were abandoned on the trial.   Attention will be directed simply to the issue actually presented by the proofs adduced.   It may be well

first to note the legal rules of construction of evidence in actions of fraud. The principle is settled beyond question that fraud is not presumed, and must be proven. Arthur v. Griswold, 55 N. Y. 410; Brackett v. Griswold, 112 N. Y. 467, 20 N. E. 376. In Nichols v. Pinner, 18 N. Y. 295, the court lays down the rule in these words:

"Fraud must be proved affirmatively. The presumption is always in favor of innocence, and not of guilt. The evidence should, therefore, be direct and strong which would authorize the repudiation of a contract on the ground of fraud, especially in the case of an executed contract."

It has been further held that if the evidence is as capable of innocent as guilty interpretation it cannot be used to establish guilt. Morris' Case, 96 N. Y. 100; Constant's Case, 133 N. Y. 640, 31 N. E. 26; Fenno's Case (Sup.) 10 N. Y. Supp. 408. And again:

"While fraud may be established by circumstantial evidence, it can only be so established by proof of such circumstances as are irreconcilable with any other theory than that of the guilt of the persons accused of fraud." Baird's Case, 96 N. Y. 567.

It will thus be seen that the law will not impute fraud without positive testimony. It is true that the testimony may be circumstantial, as at times it must; but such circumstances must point to the fraud at least with some degree of certainty. It is not enough that facts are shown that cause suspicion. Again, it will be further seen that a distinction is made between contracts which are merely executory and contracts which are executed. Executory contracts can generally be set aside with little loss. To set aside an executed contract must always cause a loss. In the case at bar this distinction has a special force. This contract was made December 28, 1889. The work of laying the mains and constructing the plant was commenced the following spring. The first illumination of the town was on the night of December 2, 1891. Extensions were thereafter ordered by the board so that construction continued down to the spring of 1893. The extension contract was made March 19, 1891. This suit was not commenced until May 5, 1893. The testimony shows that the corporation defendant has in the meantime laid 93 miles of gas mains. It has in the meantime purchased land in the town, and erected two gas holders; one with a capacity of 100,-000 cubic feet, and the other with the capacity of 500,000 cubic feet. It has expended, according to the estimate of the engineer, $600,000 for its plant. The evidence does not disclose the fact, but it is a fair presumption, that part at least of this $600,000 has been raised by the issue of bonds, which are now held by parties innocent of any fraud or claim of fraud. Innocent parties have, undoubtedly, contracted with the company upon the faith of its supposed contract rights with the town. It is undoubtedly true that this action may be commenced at any time within the statutory limit. It is further undoubtedly true that, if fraud is once established, the court cares little or nothing that the fraudulent party may lose. When, however, a contract has been executed, and large amounts of money have been expended therein, and the rights of innocent parties perchance are imperiled, the courts should and will require a stronger degree of evidence to establish the invalidity of such contracts than

would be required if the action were to set aside an executory contract, where no great loss would follow.   Especially will this be held where the party who has the right of action has quietly lain· by for three years and a half and seen all these moneys expended without protest.

What, then, is the point of attack upon this contract?   It is not claimed that the contract is wasteful, in that it provides for an exorbitant compensation for gas furnished.   The plaintiff, in his complaint, charged that the price asked was exorbitant, but upon the trial of the action such charge was expressly abandoned.   No provision in the defendant's contract is assailed as detrimental to the interests of the town, except the provision which prohibits the town from "capping" lamps.   The contract is claimed to have been fraudulent and illegal in that it did not follow the specifications which were adopted by the board of improvement, upon which was made the advertisement for bids.   It seems that upon the 26th day of November, 1889, the board of improvement adopted by formal resolution certain specifications.   The usual notice for bids was advertised in the papers as required by law.   The bid of the defendant gas company was the only one received.   The contract was thereupon made. The question presented is, did that contract follow substantially the provisions of the specifications adopted upon the 26th of November?   The defendant produced upon the trial a paper containing in typewriting specifications with certain alterations appearing thereon.   That copy had the indorsement upon the back of the president and secretary of the board.   These indorsements were made pursuant to a resolution of the board, for the purpose of identifying them as the specifications legally adopted, and upon which the advertisements for bids were made.   Those specifications, as they now appear, conform substantially to the contract which was afterwards made, and which is here assailed.   The claim of the plaintiff is that these specifications as they now appear differ in four material matters from the specifications that were adopted upon the 26th of November, the day at which the advertisement commenced, in that (1) the specifications in fact then adopted required the manufacture of gas within the town, while these specifications and the contract as made do not so require; (2) in that the specifications as then adopted reserved the right in the town authorities to diminish as well as increase the number of lamps, while these specifications as they now appear, and the contract, left in the town authorities only the power to increase,—in other words, took from them the power of "capping" lamps; (3) in that the specifications as then adopted required the contract to be finished by July 15, 1890, while the specifications as they now appear, and the contract, give the date a year later; and (4) in that the specifications as then adopted did not contain the provision, inserted in the contract as made, prohibiting any other gas or electric company from laying pipes or conductors within the town.   In support of this contention the plaintiff produces the witness R. H. Sherwood, who called three or four times to see the specifications, and afterwards obtained a copy, which is in evidence here, and marked "Ex. 3."   That copy of the specifications is the copy

claimed by the plaintiff to be the copy of the specifications adopted upon November 26th, but does not contain the matters which are claimed by the plaintiff to have been inserted at some later time, and which appear in the copy of the specifications presented here by the defendant. Mr. Sherwood swears upon cross-examination that he did not see the advertisement for bids upon the contract, and he does not know whether it was before or after that advertisement. Confessedly, there were drafts or proposed specifications in the office of the board of improvement before the meeting of November 26th, at which time the official specifications were adopted. It is claimed by the defendant that these specifications were there kept for the purpose of getting suggestions from any one who might come in as to matters in which they might be changed for the benefit of the town. Upon cross-examination Mr. Sherwood says that Mr. Fergueson, who was president of the board, said to him: "Read that over, and, if you can make any suggestions to protect the interests of the citizens, I would like to have you." If this remark were made, it is in line with the defendant's contention that these specifications shown, and which are produced here by Mr. Sherwood, were drafts or proposed specifications which were in the office before the specifications were officially adopted upon which the advertisement was made. It is not probable that Mr. Fergueson would be asking for the suggestion for the purpose of altering the specifications after the advertisement had begun, and which could not be legally altered. It also appears in the case, by testimony of Mr. Sherwood, that his relations with Mr. Fergueson were not friendly. Another copy of the specifications, precisely similar to the one produced by Mr. Sherwood, is produced upon the trial by Mr. J. Lott Nostrand, who appears here as a witness for the plaintiff, and he was a member of the board of improvement by which this contract was awarded. He states that these specifications were the only ones he ever saw or knew anything about, but he has no recollection where he got them, whether from the rooms of the board of improvement or elsewhere. Nor has he any recollection of the time when he got them. The plaintiff concedes that there were with the board of improvement other copies of the specifications, but it does not appear that Mr. Nostrand ever saw them. There is only one matter in which Mr. Nostrand will swear from his recollection that the contract as made differs from the specifications as he understood them, and that was in that the contract provided that the work should be completed by July, 1891, while the specifications called for its completion in July, 1890. Upon page 62, Mr. Nostrand swears that he was present at the meeting of November 26th; that he is not sure what the discussion there was, and that he is not sure but there was a talk about it. "We probably met with the intention of talking over the matter, and making some arrangement." The testimony of Mr. Nostrand is, in my judgment, entitled to weight. This contract was made in December, 1889. The original specifications required that it should be fulfilled by the 1st of July, 1890. It would appear to me that with the winter intervening the time was somewhat short, and the change from July, 1890, to July, 1891, would not be a very unreasonable one. The

plaintiff produces one other witness, John McKay. The witness McKay swears positively that, after he had seen this advertisement, he went and saw the specifications; that the specifications now claimed by the defendant as being the ones adopted upon November 26th were not the specifications shown him, and that the specifications shown him required that the gas should be manufactured, as well as stored, within the town. He took those specifications over to a meeting of an association of citizens, but he does not produce them here, nor are they produced by any member of the association of citizens to which he made his report. He cannot remember whether the specifications which he saw were printed or in typewriting. His recollection seems to be based upon the fact that in his opinion the requirement of the specifications that the gas should be manufactured in the town prevented the free competition of companies outside of the town which might bring gas within the town. He did not call the attention of anybody to this provision. He did not in any way protest against it, nor, as far as appears from the evidence, was any protest made to the board of improvement by any one against the provision which was deemed by him and others to prevent free competition for the contract. It is admitted that the first copies of the specifications, which are claimed by the defendant to be draft or proposed copies, did require the manufacture of the gas within the town, but defendant claims that such provision was stricken out at the meeting of November 26th, when the specifications were adopted upon which the bids were to be made. It is unfortunate, if Mr. McKay made his report to an organization of citizens, some of those citizens of that organization could not have appeared upon the trial and corroborated him as to the time when that report was made, and as to the terms of those specifications. It would seem as if such proof were easily accessible if it could have been had.

The plaintiff's counsel claims that this testimony is fully corroborated by the evidence appearing in the writings themselves. He shows that the copies of the specifications produced by Mr. Nostrand and Mr. Sherwood are copies of the original specifications produced by the defendant here, with some of the alterations there made appearing in type. He thus argues that the copies of the specifications thus produced by Sherwood and Nostrand must have been made after the copy produced by the defendant, and after certain changes were there made. He further shows that the copies produced by Sherwood and Nostrand appear to have been made by Mrs. Pettengill, a typewriter, living in Brooklyn. He produced her book, upcn which is charged, about November 6th, for making 6 copies of gas specifications, 30 folios, and November 26th, for making 3 copies gas specifications, 60 folios. To those familiar with typewriting it is shown that the copy produced by Nostrand and the one produced by Sherwood were both original copies, and were about 30 folios. It is claimed when this charge of 3 copies of 60 folios was made that in fact Mrs. Pettengill ran a paper through the typewriter twice, thus making 6 copies of 30 folios with 2 originals, which would undoubtedly be the same charge

as making 3 copies at 60 folios, as the same work would be required. From this it is argued by the plaintiff that the copies produced by Mr. Nostrand and Mr. Sherwood were the copies made upon November 26th, and were copies of the specifications as in fact they were adopted. I am not unmindful of the force of this corroborative evidence. The copy produced by the defendant, with the alterations made, and claimed to have been the copy indorsed and adopted upon November 26th, is upon thin paper, such as would be required to be used in the making of six copies. The defendant cannot explain how it is that two originals are produced in the hands of Mr. Nostrand and Mr. Sherwood, nor why it is that those typewritten copies contained part of the alterations which appear in the copy of the specifications they produced. It is sufficient at least to raise a grave suspicion that the alterations which afterwards appear in the copies produced by Mr. Nostrand and Mr. Sherwood were agreed upon at the meeting of November 26th, and that the copy was then indorsed, and that the other alterations which have caused this litigation were afterwards made. On the other hand, the witness Church, in whose handwriting appear all the alterations made, swears positively that they were all made upon November 26th. In the paper itself there is no indication that they were not all made at one time. The witness Keegan, a member of the board, swears positively that the contract made followed the specifications adopted upon the 26th of November. The witness Cowenhoven, a member of the board, swears positively that the contract made followed the specifications adopted upon the 26th of November. The witness Wardel, a member of the board, swears positively that the contract made followed the specifications adopted upon the 26th of November. And the witness Fergueson, a member of the board, swears positively that the contract made followed the specifications adopted upon the 26th of November. The testimony of these witnesses is in some matters indefinite, but it must be remembered that by reason of the plaintiff's delay more than five years have now elapsed since the transaction took place. It must be impossible, therefore, to remember the exact detail of matters then occurring. If the claim of the plaintiff is true, the witness Church is guilty not only of perjury, but of forgery. The witness Sherwood, the president of the defendant's company, swears positively that these alterations claimed by the plaintiff to have been made after November 26th followed suggestions made by him prior to that time, and before the contract was made. The design and purpose of this action is to save money for the taxpayers. In order to sustain the action, therefore, knowledge of the fraud of the municipality must be brought home to the contracting party; otherwise, if the contract were here set aside, the contracting party would have a right of action against the town for damages, which the taxpayers would have to pay. In this conflict of evidence, therefore, I am compelled to hold that the plaintiff's proof has not so far preponderated as to reach that degree of certainty which the law requires in order to set aside this contract as having been made fraudulently by the municipal au-

thorities with the connivance or knowledge of this defendant company or its officers. The large forfeitures involved in the annulment of this contract call for stronger proof than that which may raise doubt or suspicion. I do not, therefore, consider the effect of that provision in chapter 59 of the Laws of 1891 which purports to confirm the contract made. I have grave doubts of the constitutionality of that provision under the reasoning in the Rogers Case, 10 Misc. Rep. 57, 30 N. Y. Supp. 855.

2. The second cause of action alleged is a cause of action to set aside the contract of extension executed in March, 1891, whereby the life of the original contract was extended for 15 years. In the plaintiff's complaint this contract of extension is assailed as having been fraudulently made, and as being illegal and unauthorized. Upon the trial of the action the plaintiff's counsel abandoned his claim of fraud, and assailed the contract of extension upon legal grounds only. It is alleged to be illegal (1) upon the ground that Mr. Nostrand, when a member of the board, was not notified of the meeting at which the extension was made; and (2) as against public policy, in making a contract of extension before it had commenced supplying gas under the original contract. As to the first reason assigned, the evidence shows that Mr. Nostrand was at the time in Florida, and that an attempt was made to notify him, which failed by reason of his absence. I think the legal requirements have been complied with, and the municipal board is not bound to await the return of one of its members from a pleasure trip, or even a business trip, before transacting the business which may come before it. The sending of a notice, therefore, to the defendant Nostrand was excused by his absence from the state. As to the second reason alleged, it is a complete answer that the legislature has in fact authorized it. That an act may be against public policy is no legal taint where expressly authorized by the legislature of the state. The argument could with much force be made to the legislature, but as against their authority it must be unavailing with the court. Inasmuch, therefore, as this contract is not assailed on the ground of any fraud, but purely on the ground of illegality, my conclusion that the plaintiff's claim is not well founded.

3. The third cause of action alleged is to declare void the action of the board so far as by its order lamps were wastefully and fraudulently placed within the town. I have no doubt of the power of the court to regard these separate resolutions directing the placing of the lamps as contracts which, if fraudulently made with the connivance of this company, can be assailed by the taxpayer, under the statute under which this action is brought. As far as appears in the evidence in this case, the original contract as made was a harmless contract. The price of gas per lamp stands, for the purpose of this action, confessedly reasonable. The only provision assailed as unreasonable, to wit, the provision forbidding the municipality from diminishing the number of lamps, is not, in my judgment, so unreasonable as to lead to an inference of fraud. It might well be that the company would be unwilling to put large

amounts of money into a gas plant, and then to place the lamps, at its own expense, in remote quarters of the town, when so ordered by the board, with the right to any new board, with differing views, to stop the lighting of those lamps, and to cut off their compensation therefor, without remunerating them for the expense which they had incurred in placing such lamps. For the purpose of this suit, in my judgment, their orders for the placing of lamps constitute independent contracts, and, if such orders were fraudulently made, through collusion with the defendant company, they may be declared void. The complaint in this action alleges at paragraph 13:

"That there are about 3,600 street lamps to be lighted and paid for under the said contract, most of them being remote from any habitation, and through vacant country. They are useless, and were placed by the said board and officers, not in the interest of the said town or its inhabitants, but only to favor the defendant gas company, and enable it to get money wrongfully from the said town, and for no equivalent and no return. That the said contracts were inequitable and unjust, and a waste of the funds of said town and its taxpayers."

It will be noticed that there is no allegation in the complaint of any collusion between the municipality and the defendant gas company, or any knowledge on the part of the defendant gas company of any fraud on the part of the board of improvement. I cannot see that this is a fact necessarily to be alleged and proven. If defendant gas company has placed these lamps without collusion with the board, they are entitled to their compensation, and the court is without power to declare the contracts void. But assuming, for argument, that the complaint may be deemed, even by inference, to allege such collusion, has there been a cause of action established? The rule governing this action is explicitly laid down in the Talcott Case, 125 N. Y. 280, 26 N. E. 263. The court there says:

"The terms 'waste' and 'injury,' used in this statute, comprehend only illegal, wrongful, or dishonest official acts, and were not intended to subject the official action of boards, officers, or municipal bodies acting within the limitations of their jurisdiction and discretion, but which some taxpayer might conceive to be unwise, improvident, or based on errors of judgment, to the supervision of the judicial tribunals. It is believed that no action was ever maintained under this statute with the sanction of this court, without some proof or allegation that the official act or proceeding complained of was without power, or was tainted by corruption or fraud."

And the court further says:

"Any other construction would subject the discretionary action of all local officers and municipal bodies to review by the courts at the suit of the taxpayers,—a result which would burden the courts with litigation without increasing the efficiency of local administration. Whatever evils may exist in the government of cities that are due to mistakes, errors of judgment, or the lack of intelligent appreciation of official duty, must necessarily be temporary, compared with the mischief and inconvenience which judicial supervision in all cases would ultimately produce."

In the application of this rule to the facts in the case at bar there is first a practical difficulty presented. The propriety of placing lamps in a growing suburb of a large city depends upon many considerations which it is impossible to present to a court. Were the power given me in this action to order canceled the direction for certain lamps, I would find it very difficult, if not impossible, to de-

termine which lamps should be cut off. The determination of such questions depends upon many facts which are present to the minds of the local board, but which cannot be mapped out to any court so clearly as to authorize the court to say that certain lamps were ordered placed by fraud, rather than by improvidence. Again, a legal difficulty exists.. The allegation of the complaint is that these lamps were ordered to favor the defendant gas company, and to enable it to get large sums wrongfully from the town. But that this was not the sole motive would seem to be completely answered by the fact that Nostrand, as a member of the board, voted for. every lamp ordered. Plaintiff will not claim that any corrupt motive of friendship to this company actuated him. His whole course of conduct negatives such a proposition. Then, too, there is no evidence of any collusion of the gas company in the different orders given for lamps. They were all ordered upon the petitions of a taxpayer of the different localities. There is no evidence that the gas company induced the making of those petitions, or in any way influenced the giving of directions for new lamps. No business relation is shown between any member of this board and any stockholder of this company. The whole case is barren of any evidence of fraud of the gas company concerned with the ordering of new lamps. As far as appears, the lamps were ordered in the interests of the owners of outlying lands. But, when so ordered, the gas company was required by the contract to place them. I have been firmly impressed upon this trial with the conviction that the placing of many of these lamps was improvident and wasteful of the funds of the municipality. Public officers who thus waste the funds of the taxpayers, for whom they are acting as trustees, should be taught in no uncertain way that their office is a trust which cannot be abused. The law has provided a way for the punishment of such abuses of trust, but it is not in this action.

The other question remains to be considered. Plaintiff asks to have declared illegal that clause in the contract wherein the board of improvement contract to give consent to no other company to lay its mains in the streets of New Utrecht. Without considering the merits of the question, I do not conceive that it is the province of the court in this action so to declare. If illegal, it is mere surplusage, and binds no one; and, as the expenditure of no money is involved in any rights therein assumed to be given, plaintiff needs no decree of the court to protect him. These views lead to the conclusion that the cause of action has not been proven, and the complaint is dismissed, but without costs. Complaint dismissed, without costs.